113 T.C. No. 26


UNITED STATES TAX COURT


OSTEOPATHIC MEDICAL ONCOLOGY AND HEMATOLOGY, P.C., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 11551-98.          Filed November 22, 1999.


        P, a professional service corporation, specializes
in the treatment of cancer through chemotherapy.  P
uses drugs and ancillary pharmaceuticals (collectively,
the drugs) during its treatment.  The chemotherapy
treatments are prescribed by P's professional staff,
and patients do not select the type or quantity of
drugs used during the treatments.  P uses the cash
method to expense the cost of the drugs.  R determined
that the drugs were "merchandise" under sec. 1.471-1,
Income Tax Regs., and that P must use an accrual method
to report all amounts attributable to the drugs.
        <u>Held</u>:  The inherent nature of P's business is that
of a service provider, P's use of the drugs is
subordinate to the provision of its services, and P
uses the drugs as an indispensable and inseparable part
of the rendering of its services; thus, the drugs are
not "merchandise" under sec. 1.471-1, Income Tax Regs.,
and P properly used the cash method to expense the
drugs' cost.

David C. May, for petitioner.

Grant E. Gabriel, for respondent.

OPINION

LARO, Judge:  The parties submitted this case to the Court without trial.  See Rule 122.  Petitioner petitioned the Court to redetermine respondent's determination of a $50,515 deficiency in its 1995 Federal income tax.  The sole issue for decision is whether petitioner, a professional service corporation, may use the cash receipts and disbursements method (cash method) to expense the drugs and ancillary pharmaceuticals (collectively, chemotherapy drugs) used by it while providing chemotherapy treatments to its patients.  We hold it may.  Unless otherwise stated, section references are to the Internal Revenue Code as applicable to 1995, and Rule references are to the Tax Court Rules of Practice and Procedure.

## Background

All facts are stipulated and are so found.  The stipulation of facts and exhibits submitted therewith are incorporated herein by this reference.  Petitioner's principal place of business was in Clinton Township, Michigan, when it petitioned the Court.

Petitioner is a professional medical corporation that provides osteopathic services, with a speciality in oncology (mainly chemotherapy) and hematology.  Petitioner's staff

consists of physicians, nurses and nursing assistants, laboratory technicians, administrative personnel, and office workers. Petitioner has three offices in the Clinton Township area. At each of these offices, petitioner stores chemotherapy drugs and has the staffing, equipment, and supplies necessary to administer chemotherapy treatments.

Chemotherapy drugs are pharmaceutical drugs which under applicable State (Michigan) law must be prescribed by a doctor and may be sold only by a licensed pharmacist. Petitioner is not a licensed pharmacist, and it is unlawful for petitioner to sell the drugs. Petitioner may use the drugs during the performance of its chemotherapy services.

Chemotherapy drugs come in ready-to-use form or as powders or liquids that require mixing. Petitioner generally maintains about a 2-week supply of chemotherapy drugs, and it regularly purchases chemotherapy drugs from suppliers to insure that it has enough on hand to administer prescribed treatments. Chemotherapy drugs, in an unmixed form, have shelf-lives varying from about 6 months to 1 year.

When an individual first becomes a patient of petitioner, one of petitioner's physicians examines him or her to prescribe necessary treatments, and that physician records the individualized chemotherapy treatment in the patient's file. After the patient is evaluated and the physician prescribes a

chemotherapy regime, the patient begins regular, periodic treatments.  The patient does not select the type or quantity of drugs used in the treatments; this selection is within the sole discretion of petitioner's professional staff.  In accordance with standard oncology practice, patients are not examined by a physician at every chemotherapy treatment but are usually reexamined by a physician every 4 to 6 weeks during the ongoing course of treatments.  Any changes in the future course of treatments are documented in the patient's file at that time.

Petitioner's personnel mix and otherwise prepare the chemotherapy drugs that petitioner administers to a patient; the chemotherapy drugs cannot be self-administered.  One of petitioner's oncology nurses generally performs the administration, and a physician is always on site to respond to emergencies.  The physician is not always in the room during the administration.

Petitioner is a participating provider with Medicare[1] and several other private insurance carriers.  Virtually all of petitioner's patients who receive chemotherapy treatments are covered by Medicare or private insurance, and those patients are billed only for the cost of the treatments to the extent of co-payments, deductibles, and other uncovered charges.  For each

---

[1] See Health Insurance for Aged Act, Pub. L. 89-97, 79 Stat. 291 (1965), currently codified at 42 U.S.C. secs. 1395 through 1395ccc (1994).

patient visit, petitioner's staff prepares a physician's statement known as a "charge sheet", which is the document from which petitioner's billing department generates its bills. The charge sheet specifically lists the type, amount, and cost of chemotherapy and other drugs administered, and the type and cost of all professional services rendered. The charge sheets are specific as to the particulars of chemotherapy treatments so as to comply with the guidelines of Medicare and the private insurance industry. Petitioner submits the charge sheets directly to Medicare or other responsible party, and petitioner bills its patients for the copayments or other charges not covered by insurance.

Medicare and private insurers analyze on an item-by-item basis whether to reimburse the charges shown on the charge sheets. The dollar amount reimbursed for a drug administered to a patient is ascertained by reference to the average wholesale price (AWP) of the units in which the drug is packaged and sold wholesale, which AWP is published annually with quarterly updates. Generally, the reimbursement amount for drugs equals the AWP times the units used, with rounding up to the next whole unit of a drug when billing for administration of a partial unit.

It is common industry practice to charge for all medical services provided even when the health care provider anticipates it will not be paid in full for all charges. The standard charge

nationally for chemotherapy drugs is 1.5 times the AWP, and petitioner bills its patients for the drugs at this rate with the expectation that the patient will pay the excess over the amount reimbursed. With all reimbursement payments from Medicare or private insurers, petitioner receives an "Explanation of Benefits" that details the amounts allowed and disallowed as to each specific charge, and the amounts for each charge which are due from secondary insurance and/or the patient.

Petitioner has always used the cash method for purposes of both financial and tax accounting, and it has never maintained an inventory of any of the items used in its practice. Petitioner expenses as supplies the cost of all chemotherapy drugs purchased during the year; the actual cost of chemotherapy drugs which it had on hand at the end of 1995 was $31,887. Petitioner deducted on its 1995 tax return $772,522 in "medical supplies" for the actual cost of the chemotherapy drugs and $66,305 in "laboratory supplies" for the actual cost of miscellaneous nonpharmaceutical items. Petitioner reported on its 1995 tax return $2,938,726 in gross receipts and no cost of goods sold.

Respondent determined that petitioner had to inventory its chemotherapy drugs, and, thus, that petitioner's use of the cash method did not clearly reflect its income. Respondent changed petitioner's method of accounting to a hybrid method, which hybrid method accounted for the chemotherapy drugs on an accrual

method and the balance of petitioner's business on the cash method. Respondent's change to the hybrid method increased petitioner's income by: (1) $31,887, the actual cost of the chemotherapy drugs on hand at the end of 1995, and (2) $148,557, the value of petitioner's accounts receivable relating to chemotherapy drugs conveyed to patients as of the end of 1995.

## Discussion

We decide for the first time whether the furnishing of pharmaceuticals by a medical treatment facility as an integral, indispensable, and inseparable part of the rendering of medical services is the sale of "merchandise" for purposes of section 1.471-1, Income Tax Regs. In Hospital Corp. of Am. v. Commissioner, 107 T.C. 116 (1996) (HCA), we held that medical supplies and pharmaceuticals used by hospitals are so vital to the furnishing of medical services that income earned therefrom constitutes income earned from the performance of services for purposes of the nonaccrual-experience method of section 448(d)(5). In HCA, we explicitly reserved for another day the question of whether those supplies and pharmaceuticals were merchandise that had to be inventoried under section 1.471-1, Income Tax Regs. See id. at 143-144 n.18. That day is here in the factual setting of a physician's outpatient chemotherapy treatment facility.

We decide this issue in the context of whether it was an abuse of respondent's discretion to exercise his authority under section 446 and require petitioner to change from the cash method to a hybrid method.[2]  Presented is the question of whether petitioner should be required to keep inventories for tax purposes under section 471.  Respondent determined that petitioner's chemotherapy drugs were merchandise that was an income-producing factor, that petitioner therefore was required

---

[2] Sec. 446 provides in pertinent part:

SEC. 446.  GENERAL RULE FOR METHODS OF ACCOUNTING.

 (a) General Rule.--Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.

 (b) Exceptions.--If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income.

 (c) Permissible Methods.--Subject to the provisions of subsections (a) and (b), a taxpayer may compute taxable income under any of the following methods of accounting--

  (1) the cash receipts and disbursements method;

  (2) an accrual method;

  (3) any other method permitted by this chapter; or

  (4) any combination of the foregoing methods permitted under regulations prescribed by the Secretary.

to inventory the drugs, and that petitioner was required to use an accrual method to account for this inventory in order to reflect its income clearly. Petitioner asserts that it is not a merchandising business but a provider of services; to wit, chemotherapy treatments for patients stricken with cancer. Petitioner argues that it need not maintain inventories for the chemotherapy drugs used in the treatments.

We agree with petitioner that it is not required to inventory its chemotherapy drugs. We are mindful of the broad discretion accorded the Commissioner in applying sections 446 and 471. Taxpayers challenging the Commissioner's authority must prove that the Commissioner's determination is "clearly unlawful" or "plainly arbitrary". See Thor Power Tool Co. v. Commissioner, 439 U.S. 522 (1979); see also Wal-Mart Stores, Inc. & Subs. v. Commissioner, T.C. Memo. 1997-1, affd. 153 F.3d 650 (8th Cir. 1998). The fact that the Commissioner has broad authority under section 446(b), however, does not mean that the Commissioner may change a taxpayer's method of accounting with impunity. See, e.g., Prabel v. Commissioner, 91 T.C. 1101, 1112-1113 (1988), affd. 882 F.2d 820 (3d Cir. 1989). The Commissioner, for example, may not change a taxpayer's method of accounting from one that clearly reflects income to another one that the Commissioner believes more clearly reflects income. See

Ansley-Sheppard-Burgess Co. v. Commissioner, 104 T.C. 367 (1995); see also Wal-Mart Stores, Inc. & Subs. v. Commissioner, supra.

We focus our inquiry on whether the chemotherapy drugs were supplies deductible under section 162, or merchandise that must be inventoried under section 471. Section 162(a) allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business". The relevant regulations explain that

> Taxpayers carrying materials and supplies on hand should include in expenses the charges for materials and supplies only in the amount that they are actually consumed and used in operation during the taxable year for which the return is made, provided that the costs of such materials and supplies have not been deducted in determining the net income or loss or taxable income for any previous year. If a taxpayer carries incidental materials or supplies on hand for which no record of consumption is kept or of which physical inventories at the beginning and end of the year are not taken, it will be permissible for the taxpayer to include in his expenses and to deduct from gross income the total cost of such supplies and materials as were purchased during the taxable year for which the return is made, provided the taxable income is clearly reflected by this method. [Sec. 1.162-3, Income Tax Regs.]

Section 471 provides in pertinent part:

SEC. 471. GENERAL RULE FOR INVENTORIES.

> (a) General Rule.--Whenever in the opinion of the Secretary the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer on such basis as the Secretary may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income.

The relevant regulations explain that "inventories at the beginning and end of each taxable year are necessary in every case in which the production, purchase, or sale of merchandise is an income-producing factor."  Sec. 1.471-1, Income Tax Regs. Jurisprudence provides that a taxpayer with inventories must use an accrual method, unless the taxpayer shows that use of another method would produce a substantial identity of results and that the Commissioner's determination requiring a change is an abuse of discretion.  See Knight-Ridder Newspapers, Inc. v. United States, 743 F.2d 781, 789, 791-793 (11th Cir. 1984); Wilkinson-Beane, Inc. v. Commissioner, 420 F.2d 352 (1st Cir. 1970), affg. T.C. Memo. 1969-79; Ansley-Sheppard-Burgess Co. v. Commissioner, 104 T.C. at 377; see also sec. 1.446-1(c)(2)(i), Income Tax Regs.

Under the facts at hand, respondent may require petitioner to utilize an inventory method of accounting only if we find each of the following as facts:  (1) Petitioner produced, purchased, or sold merchandise, and (2) petitioner's production, purchase, or sale of that merchandise was an income-producing factor.  See Honeywell Inc. v. Commissioner, T.C. Memo. 1992-453, affd. without published opinion 27 F.3d 571 (8th Cir. 1994).  We need not reach the second part of this inquiry; i.e., whether the production, purchase, or sale of merchandise is an income-producing factor, if we are unable to find first that the

chemotherapy drugs are merchandise.  See <u>Wilkinson-Beane, Inc. v.</u> <u>Commissioner</u>, <u>supra</u>; <u>Honeywell Inc. v. Commissioner</u>, <u>supra</u>; sec. 1.471-1, Income Tax Regs.

The statute and regulations do not define the words "merchandise" or "inventory", nor do they clearly distinguish between "inventory" and "materials and supplies" that are not actually consumed and remain on hand.  We have held that "merchandise", as used in section 1.471-1, Income Tax Regs., is an item acquired and held for sale.  See <u>Wilkinson-Beane, Inc. v.</u> <u>Commissioner</u>, T.C. Memo. 1969-79.  Upon appeal, the Court of Appeals for the First Circuit agreed, stating:

> A canvassing of authorities in the accounting field yields several definitions, such as "goods purchased in condition for sale," "goods awaiting sale," "articles of commerce held for sale," and "all classes of commodities held for sale."  Clearly, the meaning of the term must be gathered from the context and the subject. * * * The common denominator, however, seems to be that the items in question are merchandise if held for sale.  [<u>Wilkinson-Beane, Inc. v. Commissioner</u>, 420 F.2d at 354-355; citations omitted.]

Whether an item is acquired and held for sale is governed by the substance of the transaction and not its form.  See <u>Honeywell</u> <u>Inc. v. Commissioner</u>, <u>supra</u>.  We take into account the particular facts and circumstances of the taxpayer in each case and the manner and context in which the taxpayer operates the business at hand.  See <u>Wilkinson-Beane, Inc. v. Commissioner</u>, <u>supra</u>; <u>Thompson</u> <u>Elec., Inc. v. Commissioner</u>, T.C. Memo. 1995-292; <u>Honeywell Inc.</u> <u>v. Commissioner</u>, <u>supra</u>; <u>J.P. Sheahan Associates, Inc. v.</u>

Commissioner, T.C. Memo. 1992-239.  We have previously examined

service transactions in a variety of industries to determine

whether the transactions in substance involved solely the sale of

a service, or whether the transactions involved the sale of both

a service and merchandise.  Those cases are not readily

reconcilable and underscore the fact-intense nature of this

inquiry.[3]  We have not, however, explored this issue in the

context of the health care industry and have never had a

situation where, as here, applicable laws would prohibit the

taxpayer from selling the items in issue without provision of the

attendant service.

We find the instant setting distinguishable from the setting

of those cases in which we have held that goods utilized by a

service provider were merchandise for purposes of the inventory

rules.  We give significance to the uniqueness of the industry in

---

[3] See, e.g., Addison Distribution, Inc. v. Commissioner,
T.C. Memo. 1998-289 (electronic materials were merchandise);
Thompson Elec., Inc. v. Commissioner, T.C. Memo. 1995-292
(electrical contractor's wire, conduit, and electrical panels
were merchandise); Honeywell Inc. v. Commissioner, T.C. Memo.
1992-453 (rotable spare parts used in maintenance service
business were not merchandise; Court rejected argument that
taxpayer's "consideration" of the parts' cost to set its fixed
fee established that the parts were acquired and held for sale),
affd. without published opinion 27 F.3d 571 (8th Cir. 1994); J.P.
Sheahan Associates, Inc. v. Commissioner, T.C. Memo. 1992-239
(contractor's roofing materials were merchandise); Surtronics,
Inc. v. Commissioner, T.C. Memo. 1985-277 (electroplating metals
were merchandise); Wilkinson-Beane, Inc. v. Commissioner, T.C.
Memo. 1969-79 (funeral business' caskets were merchandise), affd.
420 F.2d 352 (1st Cir. 1970).

which petitioner operates in relation to the other service industries we have addressed on this issue and bear in mind the recent case of Hospital Corp. of Am. v. Commissioner, 107 T.C. 116, 143-145 (1996). There, as explained in more detail below, we held that the income attributable to the pharmaceuticals and various medical supplies frequently used by the personnel of the taxpayer/hospital while performing medical services was not income from the sale of goods for purposes of the nonaccrual-experience method of section 448(d)(5).[4] We held that those items were "inseparably connected" to the taxpayer's services. See id. at 143.

Like the taxpayer in HCA, petitioner's business is a quintessential service business. It is a health care provider that administers chemotherapy treatments to patients with cancer. Although it furnishes chemotherapy drugs to its patients as part of its service, a person cannot obtain the drugs but for the chemotherapy treatments, and the treatments require the extensive and specialized service of petitioner's professional staff. Petitioner's professional staff, as an integral and indispensable part of furnishing chemotherapy drugs to a patient, must examine the patient and prescribe a treatment regime, monitor the length,

---

[4] The medical supplies included items such as radiological dyes, casts, crutches, canes, walkers, bandages, sutures, splints, skin staples, various implants such as joint replacements, pacemakers, heart valves, orthopedic devices, and physical and occupational therapy items.

kind, quantity, and frequency of the treatments, and reevaluate the patient on an ongoing basis. That these services are critical and essential to the furnishing of the chemotherapy drugs by petitioner's staff cannot be denied.

Petitioner is not a merchandiser. Although it is true that petitioner transfers the tangible quality of the chemotherapy drugs to its patients when it administers the drugs to them, petitioner does so only as an integral and inseparable part of its service. Petitioner is precluded by law from selling the chemotherapy drugs to any person without providing the medical service, and the drugs are not susceptible of self-administration. In fact, the only way that a person may legally receive the chemotherapy drugs from petitioner is to agree to petitioner's overall chemotherapy service, and, when they do agree to this service, they have no say in the type or quantity of chemotherapy drugs which petitioner uses in their care. Usually, they are not even aware of the type or quantity of chemotherapy drugs used on them as part of their treatment. Where, as here, the service provider dispenses the drugs as an indispensable and inseparable part of the rendering of its services, the service provider is not selling "merchandise". The service provider is using the items as supplies which are essential to the provision of its services. A medical practice such as petitioner's is inherently a service business, and the

drugs administered in the practice are subordinate to the provision of the medical services.

We disagree with respondent's contention that "The transfer of the drugs is clearly a commercial transaction" to the extent he implies a commercial transaction is the conveyance of merchandise.  Given the nature of the services petitioner provides and the substance of the service transactions, we are convinced petitioner is not selling merchandise when it administers chemotherapy drugs.  The case of Abbott Labs. v. Portland Retail Druggists Association, Inc., 425 U.S. 1 (1976), parallels that conviction.  There, the Supreme Court decided whether drugs purchased by a nonprofit hospital at prices lower than those charged commercial pharmacists were exempt from the antiprice discrimination provisions of the Robinson-Patman Antidiscrimination Act, ch. 592, 49 Stat. 1526 (1936), 15 U.S.C. sec. 13(a) (1994).  The exemption generally applies where the nonprofit institution is purchasing the drugs for its "own use" as opposed to for sale to patients.  In siding with the hospital's contention that it was exempt, the Court stated:

> it seems to us to be very clear that a hospital's purchase of pharmaceutical products that are dispensed to and consumed by a patient on the hospital premises, whether that patient is bedded, or is seen in the emergency facility, or is only an outpatient, is a purchase of supplies for the hospital's "own use," * * *.  In our view, * * * this is so clear that it needs no further explication.  [Abbot Labs. v. Portland Retail Druggists Association, supra at 10-11; emphasis added.]

This Court has also stated similarly.  See St. Luke's Hosp. v. Commissioner, 35 T.C. 236, 238 (1960), wherein the Court stated that the taxpayer hospital was "not a merchandising business, and * * * has no merchandise inventories which would require the use of an accrual method in keeping its books or reporting its income.  Its income is derived from providing hospital and professional care to the sick."

Respondent's characterization of the chemotherapy drugs as merchandise offends the natural and ordinary meaning of the term "merchandise".  The word "merchandise" denotes commodities or goods that are bought and sold in business.  See Merriam Webster's Collegiate Dictionary 727 (10th ed. 1996).  Although pharmaceuticals could reasonably be construed to be merchandise in some contexts; e.g., when purchased at a grocery store for self-administration at home, it does not necessarily follow that pharmaceuticals are merchandise in all contexts.  The latter proposition is especially true under the facts at hand where petitioner's patients generally cannot be understood to consider themselves as purchasers of "merchandise" during the course of their medical treatment.  The chemotherapy drugs are administered by petitioner's trained, licensed, and specialized physicians and other health-related professionals during the rendition of a unique medical service, and, when administered, the drugs are not "goods [that were] purchased in condition for sale," or "articles

of commerce held for sale."  Simply put, petitioner is not peddling products.

Respondent looks to the value of the chemotherapy drugs and asserts that petitioner's business is part service, part sale. We disagree.  The mere fact that the chemotherapy drugs are expensive is insufficient to transmute the transaction from the sale of a service to the sale of merchandise and a service.  The common denominator that the items be held for sale is lacking on these facts.  Petitioner's chemotherapy treatment business is a pure service business and not, as respondent asserts, a mixed service and merchandising business.  See, e.g., Hewlett-Packard Co. v. United States, 71 F.3d 398 (Fed. Cir. 1995) (taxpayer's computer maintenance business was a service business, not mixed service and merchandise business, despite installation of parts); Honeywell, Inc. v. Commissioner, T.C. Memo. 1992-453 (taxpayer's computer maintenance business was a service business, not mixed service and merchandise business, despite installation of parts), affd. without published opinion 27 F.3d 571 (8th Cir. 1994).

We find no cases on this issue analogous, much less controlling.  The reported authorities, including those cases where the court found that the merchandise at issue there was sold either with or without a service, are all materially distinguishable from the facts herein given the uniqueness of the service provided.  Respondent relies on the seminal case of

Wilkinson-Beane, Inc. v. Commissioner, 420 F.2d 352 (1st Cir. 1970), affg. T.C. Memo. 1969-79. There, the taxpayer was an undertaker that sold caskets as part of its funeral service. In finding that the caskets were merchandise for purposes of section 471, the Court of Appeals for the First Circuit noted that the taxpayer normally kept an inventory of some 35 caskets, that the caskets were not necessarily used during the year but were purchased and occasionally carried for long periods of time, that the caskets were on display and played a central role in the "sale" of the taxpayer's service, and that there was a direct relationship between the magnificence of the caskets and the cost of the service. See id.

Those factors are not present here. Petitioner kept no more than a 2-week supply of chemotherapy drugs on hand and used virtually all the drugs during the taxable year. The drugs also were not displayed to patients for selection, and patients played no role in determining the type or amount of drugs used on them. Furthermore, unlike the taxpayer's business in Wilkinson-Beane, Inc., the type of chemotherapy drugs or the "magnificence" thereof played no role in whether patients chose to purchase petitioner's services. The variable factor in the cost of a patient's treatment is a factor out of the patient's control; i.e., the type and severity of the patient's condition. We also find it critical that a person is unable to obtain the

chemotherapy drugs without purchasing petitioner's service.  We find nothing in the case of Wilkinson-Beane, Inc. that would cause us to believe that the taxpayer's services there depended on the purchase of caskets from it.  Instead, the taxpayer in Wilkinson-Beane, Inc., by choice, sold the funeral services and caskets as a package.

Respondent also relies on Knight-Ridder Newspapers, Inc. v. United States, 743 F.2d 781 (11th Cir. 1984).  There, the Court of Appeals for the Eleventh Circuit considered whether the taxpayer, who produced and sold newspapers, was required to keep inventories.  The taxpayer argued that it was a service business in that it provided information for its readership and advertisement for its clients.  The court found that even though the taxpayer sold an extremely perishable commodity (a 2-day-old newspaper is stale) and had no inventory of finished goods, the taxpayer was required to account for inventories because the newspapers were merchandise and there was a significant fluctuation of newsprint and ink on hand.

The facts of Knight-Ridder Newspapers, Inc. v. United States, supra, are materially distinguishable from the facts at hand.  In contrast to the instant case, the taxpayer in Knight-Ridder, Inc. clearly manufactured a product (newspapers) and used raw materials (paper and ink) in the manufacturing process.  We, like the Court of Appeals for the Eleventh Circuit, find

unconvincing the taxpayer's argument that the readership was purchasing a service.

We also find the facts herein to be markedly different from the facts presented in the various cases on this issue involving contractors and subcontractors. In all of those cases where we found the taxpayer was selling merchandise, the contractor's services involved installation of products and the customers came to the contractors to purchase the products as well as the installation services. See, e.g., Thompson Elec., Inc. v. Commissioner, T.C. Memo. 1995-292 (taxpayer was selling merchandise in connection with a service when he installed wiring, conduits, electrical panels, and lighting fixtures); J.P. Sheahan Associates, Inc. v. Commissioner, T.C. Memo. 1992-239 (contractor's roofing materials were merchandise); Surtronics, Inc. v. Commissioner, T.C. Memo. 1985-277 (electroplating metals were merchandise). The customers of the taxpayers also could have personally purchased the merchandise elsewhere and either installed the merchandise themselves, if they had the time and expertise to do so, or contracted with a third party to install the merchandise for them. In the instant case, by contrast, persons seeking chemotherapy treatment may not buy the drugs elsewhere, and they may not apply the drugs themselves.

Respondent unduly focuses on the fact that petitioner listed on the bills submitted to Medicare and private insurers the type

and amount of chemotherapy drugs used on its patients but did not itemize the less expensive supplies. While we agree with respondent that the itemization of the drugs on the bills is a fact properly considered, see, e.g., Thompson Elec., Inc. v. Commissioner, supra, we disagree with respondent that it is dispositive of the issue. The substance of the transactions at issue is that a service is provided by and purchased from petitioner. Petitioner and other health care providers today must operate under a myriad of statutory, regulatory, and contractual mandates the purpose of which is aimed at management of care and cost containment in the health care industry. See, e.g., 42 U.S.C. secs. 1395 through 1395ccc (1994); 42 C.F.R. secs. 405.201 through 405.2470 (1998); Health Care Finance Administration, Medicare Provider Reimbursement Manual (Pubs. 15-1 and 15-2) (Rev. 3-93). Undoubtedly, as the costs of medical supplies increase, so do the regulatory and contractual directives for itemization and justification. There is no evidence petitioner provided those itemizations for merchantable purposes or because it was selling merchandise. Rather, the manner and form in which petitioner prepares its bills are dictated by applicable laws, contracts with private insurers, and the environment of the industry in which it operates. We decline to attach further accounting or other significance thereto.

Our declining to attach accounting significance to the bills is supported by Federal Medicare statutes and regulations.  As stipulated by the parties, the chemotherapy treatments and drugs at issue are covered by Medicare.  Medicare covers only medical "services" and does not cover prescription drugs that can be self-administered.  See 42 C.F.R. sec. 410.29 (1998).[5]  In creating legislative coverage for medical services, Congress was astutely aware that health care providers may need to use supplies or administer drugs incident to and as an integral part of their services.  As pertinent, the Health Insurance for Aged Act, Pub. L. 89-97, sec. 1861, 79 Stat. 291, 321 (1965), 42 U.S.C. sec. 1395x(s) (1994), provides as follows:

> The term "medical and other health services" means any of the following items or services:
>
> (1) physicians' services;
>
> (2)(A) services and supplies (including drugs and biologicals which cannot, as determined in accordance with regulations, be self-administered) furnished as an incident to a physician's professional service, of kinds which are commonly furnished in physicians' offices and are commonly either rendered without charge or included in the physicians' bills.

---

[5] This is true for the fee-for-service statutory coverage under Medicare.  The Secretary of Health and Human Services may contract with private insurers (health maintenance organizations) to provide benefits to beneficiaries under Medicare.  See Health Insurance for Aged Act, Pub. L. 89-97, 79 Stat. 291 (1965), 42 U.S.C. sec. 1395mm (1994).  The beneficiaries that opt for coverage under a health maintenance organization plan may have prescription drug coverage under their contract with the insurer.

The chemotherapy treatments administered by petitioner, including the chemotherapy drugs, are considered part of the medical service under Medicare and are within the scope of Medicare's coverage. Congress explicitly provided that charging for the drugs on the bill does not change the nature of the transaction from the provision of a covered "service" to the sale of noncovered prescription drugs. See 42 U.S.C. sec. 1395x(s) (1994); see also 42 C.F.R. secs. 410.10, 410.26, 410.27 (1998).

Respondent is also unduly impressed by the fact that petitioner's physicians do not administer the treatments and are generally not present when treatments are administered by oncology nurses. This is irrelevant to the inquiry of whether petitioner is selling a service or a service and merchandise, and we place no significance on it. We disagree with respondent's likening the facts herein to "prescription drugs in a drug store -- drugs which are clearly merchandise requiring the use of inventories." When a drug store sells drugs, there is little if any specialized and personalized service element attendant to the sale. Respondent's analogy is flawed.

Respondent argues the chemotherapy drugs comprised 26 percent of petitioner's gross receipts, that the drugs are billed to responsible parties at 1.5 times the AWP, and that the cost of the chemotherapy drugs was dramatically higher than the cost of other supplies. These factors go to whether the sale of the

"merchandise" is an income-producing factor.  Without addressing the merits of these arguments, we do not interpret section 1.471-1, Income Tax Regs., to require that if a material is an income-producing factor it must, per se, be "merchandise".  The section provides that "inventories * * * are necessary in every case in which the production, purchase, or sale of merchandise is an income-producing factor".  See sec. 1.471-1, Income Tax Regs. Because we conclude that the chemotherapy drugs used in the administration of the chemotherapy treatments are not merchandise, we need not and do not reach the question of whether merchandise is an income-producing factor in petitioner's business.

As mentioned above, our conclusion parallels our holding in Hospital Corp. of Am. v. Commissioner, 107 T.C. 116 (1996), where the hospital's professional staff frequently used pharmaceuticals and medical supplies to provide medical care to patients. Respondent argued in that case that the income attributable to the pharmaceuticals and supplies could not be reported using the nonaccrual-experience method of section 448(d)(5) because the income was attributable to the sale of "goods".  Id. at 141. Under that method, an accrual method taxpayer need not accrue amounts to be received for the performance of services that, on the basis of experience, will not be collected.  See sec. 448(d)(5).  The nonaccrual-experience method may not be used to

the extent amounts are attributable to a "taxpayer's activities with respect to * * * selling goods".  Sec. 1.448-2T(d), Temporary Income Tax Regs., 52 Fed. Reg. 22775 (June 16, 1987).

We held in HCA that the taxpayer's income attributable to the pharmaceuticals and medical supplies was service income because it was "inseparably connected" to the performance of services.  Hospital Corp. of Am. v. Commissioner, 107 T.C. at 143.  Consistent with that holding, the income that petitioner earned here from its use of the chemotherapy drugs must also be considered service income.  Service income, by definition, does not include income from the sale of goods.  See, e.g., sec. 1.448-2T(d), Temporary Income Tax Regs., 52 Fed. Reg. 22775 (June 16, 1987).  The logical conclusion is that the underlying items giving rise to service income also are not "merchandise".  As we discussed above, the meaning of the word "merchandise" is no broader than the meaning of the word "goods", and, if anything, the word "merchandise" is a subset of the word "goods".  As a matter of fact, not even respondent has argued that an item can be "merchandise" for one purpose of the Code but not a "good" for a different purpose.  Nor has respondent argued that an item the income from which may be reported on the nonaccrual-experience method may be inventory for purposes of section 471.

The notice of deficiency is worded broadly as to the specific basis for respondent's determination that the cash

method does not clearly reflect petitioner's income.  On brief, however, respondent's argument as to why petitioner's use of the cash method does not clearly reflect income articulates that the chemotherapy drugs are merchandise that must be inventoried. Respondent does not dispute that petitioner's use of the cash method clearly reflects income to the extent that the chemotherapy drugs are not merchandise.  We need not and do not engage in further analysis of the clear reflection of income standard of section 446.[6]  See Concord Consumers Housing v. Commissioner, 89 T.C. 105, 106 n.3 (1987); Estate of Fusz v. Commissioner, 46 T.C. 214, 215 n.2 (1966).  Based on the foregoing, we hold that respondent abused his discretion in requiring petitioner to use the hybrid method and that petitioner may report all its income and expenses under the cash method.

We have considered all arguments in this case for a contrary holding and, to the extent not discussed above, find those

---

[6] We are mindful of Asphalt Prods. Co. v. Commissioner, 796 F.2d 843 (6th Cir. 1986), affg. in part and revg. in part Akers v. Commissioner, T.C. Memo. 1984-208, revd. on another issue 482 U.S. 117 (1987), wherein the Court of Appeals for the Sixth Circuit held that the taxpayer's method of accounting did not clearly reflect its income.  The setting of Asphalt Prods. Co. is distinguishable from the setting at hand.  The issue there was not the issue before us today; i.e., whether the furnishing of pharmaceuticals by a medical treatment facility as an integral, indispensable, and inseparable part of the rendering of medical services is the sale of "merchandise" for purposes of section 1.471-1, Income Tax Regs.  That case also involved primarily a significant accumulation of accounts receivable at yearend and neither involved nor addressed whether the disputed items of inventory (asphalt) were merchandise in the first place.

arguments to be without merit or irrelevant.  To reflect the foregoing,

<u>Decision will be entered</u>

<u>for petitioner.</u>

Reviewed by the Court.

CHABOT, PARR, WELLS, COLVIN, BEGHE, FOLEY, VASQUEZ, GALE, and THORNTON, <u>JJ</u>., agree with this majority opinion.

MARVEL, <u>J</u>., concurs in the result only.

RUWE, <u>J</u>., dissents.

PARR, <u>J</u>., concurring:  I agree with the majority's opinion, and write separately merely to emphasize that each case that comes before this Court presents a unique set of facts and is decided on its own merits.  Although we now find that the facts of this case are "markedly different" from the facts of some of the cases we have decided involving construction contractors, I believe that the principles enunciated here also apply to construction cases.  This is true, for example, when a building material is indispensable and inseparable from the service provided by the construction contractor.  See, e.g., <u>Galedrige Constr., Inc. v. Commissioner</u>, T.C. Memo. 1997-240.

BEGHE, <u>J</u>., agrees with this concurring opinion.

BEGHE, J., concurring:  I write separately to tie up or at least pick at a loose end left by respondent's determination and arguments:  the proper tax treatment of the slightly more than 2-week supply of chemotherapy drugs costing $31,887 on hand at the end of the taxable year.[1]

Respondent, having tried to put petitioner on the accrual method with respect to "sales" of chemotherapy drugs, determined that petitioner's income should be increased not only by the cost of such drugs on hand at yearend in the amount of $31,887, but also by $148,557, the value of petitioner's accounts receivable relating to such drugs transmitted to patients during the year. Rejecting respondent's "sales" characterization in favor of treating petitioner's operations as an overall service business, we have thereby rejected respondent's determination putting petitioner on a hybrid method that would require accrual of its yearend receivables with respect to transmissions of such drugs.

Respondent did not assert or argue, as an alternative fall-back position, that petitioner's deduction of the cost of drugs on hand at yearend should be deferred to the following year.  The Court need not sua sponte make that adjustment, particularly where the proper result in this case is not clear, in part because respondent did not make a stand-alone clear-reflection-

---

[1] $772,522 ÷ 26 = $29,712.384 (average cost of 2-week supply) < $31,877 (actual on hand).

of-income determination (or even argument) with respect to such drugs. But, because other cases under submission to the Court present similar or analogous issues, and because the issue seems to be a recurring one, a premonitory attempt to tidy up may not be amiss.

The relevant authority is section 1.162-3, Income Tax Regs., "Cost of materials", which provides as follows:

> Taxpayers carrying materials and supplies on hand should include in expenses the charges for materials and supplies only in the amount that they are actually consumed and used in operation during the taxable year for which the return is made, provided that the costs of such materials and supplies have not been deducted in determining the net income or loss or taxable income for any previous year. If a taxpayer carries incidental materials or supplies on hand for which no record of consumption is kept or of which physical inventories at the beginning and end of the year are not taken, it will be permissible for the taxpayer to include in his expenses and to deduct from gross income the total cost of such supplies and materials as were purchased during the taxable year for which the return is made, provided the taxable income is clearly reflected by this method.

The accounting authorities are in accord: This regulation means that "Supplies in and of themselves are not considered inventory and, thus, will not cause the taxpayer to be required to use accrual accounting," Bauernfeind, Income Taxation Accounting Methods and Periods 3-4 (1991), "supplies are deferred expenses under Reg. § 1.162-3 and not inventory under § 471", id. 3-14, n. 61, and "when the taxpayer's inventories are of supplies only, use of the cash method is permitted. These items are not

inventories under section 471.  They are not held for sale in the ordinary course of business."  Gertzman, Federal Tax Accounting 3-55 (2d ed. 1993) (Gertzman).

The regulation says that materials and supplies cannot be currently expensed unless four tests are met:  (1) They are "incidental"; (2) no record of consumption is kept; (3) no physical inventories are taken at the beginning and end of the year; and (4) income is clearly reflected.  Petitioner in this case would appear to flunk the first three tests: (1) Chemotherapy drugs transmitted to patients in the course of petitioner's rendering of medical services are a substantial portion of petitioner's gross receipts and are a material income producing factor, as evidenced by the markups shown in petitioner's billing records; and (2) and (3) records of consumption and of supplies on hand at yearend are kept; indeed such records seem to be required by Medicare.  However, as to (4), respondent has not made a stand-alone clear-reflection-of-income determination, having chosen to rely solely on the presence of merchandise requiring inventories as compelling automatic adoption of the accrual method of accounting, the position that we have rejected.

In other cases of service providers, such as small contractors in the construction industry, an adjustment treating yearend supplies as deferred expense might very well be

appropriate, provided that respondent makes the necessary
determinations.  Compare <u>J.P. Sheahan Associates, Inc. v.
Commissioner</u>, T.C. Memo. 1992-239, with <u>Thompson Elec., Inc. v.
Commissioner</u>, T.C. Memo. 1995-292, which present different
findings of fact regarding yearend materials and supplies.

As Gertzman states at 6-30:

> The rationale behind this provision [the sec. 162-
> 3 regulation] seems clear.  Many taxpayers do not
> maintain financial accounting records of consumption
> and do not take physical inventories of the supplies on
> hand at the beginning and end of the year for business
> purposes.  In these cases, it would be inconsistent
> with the book conformity requirement of Section 446(a),
> impractical, and unduly burdensome to require that they
> undertake such record-keeping responsibilities or make
> such physical counts solely for tax purposes.  However,
> to protect the Treasury against taxpayers who might
> avoid undertaking these activities solely for the
> purpose of obtaining a tax benefit, two protections are
> afforded.  First, the supplies must be incidental and,
> second, the taxable income so computed must be
> reflected clearly * * * [citation omitted.]

The regulation appears to be not much more than an
illustration of the rule that expenditures that result in assets
having a life beyond the end of the year must be capitalized.
See sec. 263; <u>INDOPCO, Inc. v. Commissioner</u>, 503 U.S. 79 (1992).
Without attempting to predict the outcome of a hypothetical, see
<u>Gulf Oil Corp. v. Commissioner</u>, 89 T.C. 1010, 1044 (1987)
(Chabot, <u>J.</u>, concurring), affd. on other grounds 914 F.2d 396 (3d
Cir. 1990), it suffices to note that the section 162 regulation
authorizes the Commissioner in appropriate cases to treat
supplies on hand at yearend as deferred expenses.

HALPERN, _J_., dissenting:

I.  Introduction

Respondent determined a deficiency in petitioner's 1995 Federal income tax liability.  That deficiency resulted from respondent's rejection of the cash receipts and disbursements method of accounting (the cash method) used by petitioner to compute taxable income and his recomputation of petitioner's 1995 taxable income under a hybrid method of accounting.  Under that method (the hybrid method), petitioner was required to use an accrual method to account for purchases and sales of merchandise.  Respondent recomputed petitioner's taxable income pursuant to his authority to require a taxpayer to use a method of accounting that clearly reflects income, if the method used by the taxpayer does not clearly reflect income.  See sec. 446(b).

Whether a particular method of accounting clearly reflects income is a question of fact, and the issue must be decided on a case-by-case basis.  See, e.g., Hamilton Indus., Inc. v. Commissioner, 97 T.C. 120, 128-129 (1991).  Generally, where respondent has determined that a taxpayer's method of accounting does not clearly reflect income, the taxpayer must demonstrate either that his method of accounting clearly reflects income or that respondent's method does not clearly reflect income.  See Asphalt Prods. Co. v. Commissioner, 796 F.2d 843, 847 (6th Cir. 1986), affg. in part and revg. in part T.C. Memo. 1984-208.

Petitioner has demonstrated neither that the cash method clearly reflected its income nor that the hybrid method does not. Petitioner has demonstrated to the majority's satisfaction, however, that its business is a service business. The majority holds: "Service income, by definition, does not include income from the sale of goods." Majority op. p. 26. Therefore, reasons the majority, petitioner is not engaged in the sale of merchandise (a word that the majority equates with the word "goods"). Id. Since petitioner is not engaged in the sale of merchandise, the majority concludes that respondent may not require petitioner to use "an inventory method of accounting". Majority op. p. 11; see sec. 1.471-1, Income Tax Regs. Finally, limiting its consideration to the incompatibility of the cash method with an inventory method of accounting, see sec. 1.446-1(c)(2)(i), Income Tax Regs., the majority finds that respondent abused his discretion in requiring petitioner to use the hybrid method and that petitioner may continue to report all of its income and expenses under the cash method.

I dissent from the conclusion that petitioner is not engaged in the sale of merchandise. I also wish to caution against undue reliance on the majority's conclusion that respondent abused his discretion in requiring petitioner to use the hybrid method. As will be explained, by his answer to the petition, respondent has limited the issues before the Court.

II.  Facts

The majority has set forth many of the facts stipulated by the parties, and, for the most part, I shall not repeat those facts.  The following facts relate to petitioner's return, respondent's determination of a deficiency, and the pleadings in this case.

On its Form 1120, U.S. Corporation Income Tax Return, for 1995, petitioner reported gross receipts of $2,938,726, no amount of cost of goods sold, and a gross profit equal to its gross receipts.  Among other items, petitioner deducted $772,522 for "medical supplies" (chemotherapy drugs), $600,328 for compensation paid to its three physician-shareholder-officers (officer compensation), and other salaries and wages of $630,381. Petitioner's deduction for chemotherapy drugs equaled 26 percent of its reported gross receipts and gross profits and 129 percent of its officer compensation.

For 1995, under the hybrid method, respondent disallowed the deduction for chemotherapy drugs claimed by petitioner and required petitioner to recompute its gross profit by subtracting from gross receipts (determined under an accrual method) the cost of the chemotherapy drugs "conveyed" (sold) by petitioner during that year.  The net adjustment to petitioner's 1995 taxable income (the net adjustment) was an increase of $180,344, resulting from (1) an increase of $148,557 in gross receipts to

reflect accounts receivable with respect to chemotherapy drugs and (2) an increase in closing inventory for the actual cost, $31,887, of such drugs on hand at the end of 1995.

In respondent's notice of deficiency in tax (the notice), respondent explains the net adjustment as follows:

> It is determined that since the cash basis of accounting does not clearly reflect income as required by the Internal Revenue Code section 446(b), the Government is changing the taxpayer's method of accounting from the overall cash receipts and disbursements method of accounting to a hybrid method by which purchases and sales of merchandise are accounted for on the accrual method of accounting, with maintenance of inventories.

In the petition, petitioner avers, among other things, that it is a qualified personal service corporation within the meaning of section 448(d)(2), "thus allowing it the use of the cash method of accounting." See sec. 448(a) and (b). In the answer, respondent denies petitioner's averment that it is allowed to use the cash method and "[a]lleges that the petitioner is required to maintain inventories and, therefore, is required to use the accrual method for the purchase and sale of inventories."

III. Pertinent Provisions of the Code and Regulations

Gross income is defined in section 61(a), which includes, as an item of gross income, "[g]ross income derived from business". Sec. 61(a)(2). In pertinent part, section 1.61-3(a), Income Tax Regs., provides: "In a manufacturing, merchandising, or mining business, 'gross income' means the total sales, less the cost of

goods sold, plus any income from investments and from incidental or outside operations or sources." The regulations thus recognize that a necessary step in the calculation of the gross income from sales (at least in a manufacturing, merchandising, or mining business) is a determination of the cost of goods sold. That recognition implies the use of inventories, to determine the cost of goods sold.[1] Section 1.162-1(a), Income Tax Regs., confirms the role that inventories play in the determination of

--------

[1] The determination of cost of goods sold and gross income from sales for a manufacturer involves the use of inventories pursuant to the basic accounting equation described below:

| | | |
|---|---|---|
| Beginning inventory | $ | XXX |
| Purchases of inventory | | XXX |
| Production costs incurred | | XXX |
| | | |
| Total cost of goods available for sale | | XXX |
| Less: Ending inventory | | XXX |
| Cost of goods sold | $ | XXX |
| | | |
| Gross receipts from sales | $ | XXX |
| Less: Cost of goods sold | | XXX |
| Gross income from sales (sec. 61) | $ | XXX |

It can be seen from the foregoing equation that the amount of a taxpayer's ending inventory and cost of goods sold both have a very direct effect on the amount of the taxpayer's gross income from sales; however, those effects are exerted in opposite directions. All other things being constant, as a taxpayer's ending inventory increases in amount, its cost of goods sold decreases, and its gross income from sales increases. In contrast, as a taxpayer's ending inventory decreases in amount, its cost of goods sold increases, and its gross income from sales decreases. The foregoing equation and comment appear in Schneider, Federal Income Taxation of Inventories, sec. 1.01, pp. 1:4-1:5 (1999).

gross income from sales: "The cost of goods purchased for resale, with proper adjustment for opening and closing inventories, is deducted from gross sales in computing gross income."

Section 446(a) provides the general rule for methods of accounting: "Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books." In pertinent part, section 446(b) provides: "[I]f the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income."

Section 471(a) is specific with respect to the use of inventories:

> SEC. 471(a). General Rule.--Whenever in the opinion of the Secretary the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer on such basis as the Secretary may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income.

The Secretary has exercised the discretion conferred upon him by Congress in section 471 by requiring, pursuant to regulations, that, "[i]n order to reflect taxable income correctly, inventories at the beginning and end of each taxable year are necessary in every case in which the production, purchase, or

sale of merchandise is an income-producing factor." Sec. 1.471-1, Income Tax Regs.

The determination that a taxpayer must maintain inventories has two important consequences for the computation of the taxpayer's taxable income. First, to the extent that costs incurred by the taxpayer are reflected in items of inventory that, at the end of the taxpayer's taxable year, remain unsold, such costs will not contribute to the cost of goods sold for that year and, thus, will result in a correspondingly higher gross income from sales for the year.[2] Second, if a taxpayer is required to use inventories, then, to reflect its income clearly, it must use an accrual method of accounting with respect to purchases and sales of inventory items. See sec. 1.446-1(c)(2)(i), Income Tax Regs.[3] The rationale behind this accrual requirement is explained in Knight-Ridder Newspapers, Inc. v. United States, 743 F.2d 781, 789 (11th Cir. 1984) ("According to accounting wisdom, the income realized from the sale of

_____

[2] But cf. sec. 1.471-4, Income Tax Regs. ("Inventories at cost or market, whichever is lower.")

[3] The taking of inventories does not of itself represent a separate and distinct method of accounting. As Professor Chirelstein states: "Rather, it is a component of the over-all accounting procedure whose essential purpose is to establish the cost of goods sold as a step towards determination of the taxpayer's gross income from business operations." Chirelstein, Federal Income Taxation, A Law Student's Guide to the Leading Cases and Concepts, par. 12.03 at 269 (8th ed. rev. 1999).

merchandise is most clearly measured by matching the cost of that merchandise with the revenue derived from its sale.")

Even if a taxpayer need not maintain inventories, the recovery of costs associated with the production of income may not be governed by the taxpayer's method of accounting. That treatment is well known with respect to the recovery of certain capital expenditures by way of the deduction for depreciation. See sec. 167(a); sec. 1.446-1(a)(4)(ii), Income Tax Regs. ("Expenditures made during the year shall be properly classified as between capital and expense.") More pertinent to our case is section 1.162-3, Income Tax Regs., which addresses the cost of materials and supplies (without distinction, supplies) that do not constitute inventory. Unless the purchase of such supplies constitutes a capital expenditure, section 1.162-3, Income Tax Regs., provides:

> Taxpayers carrying materials and supplies on hand should include in expenses the charges for materials and supplies only in the amount that they are actually consumed and used in operation during the taxable year for which the return is made, provided that the costs of such materials and supplies have not been deducted in determining the net income or loss or taxable income for any previous year. If a taxpayer carries incidental materials or supplies on hand, for which no record of consumption is kept or of which physical inventories at the beginning and end of the year are not taken, it will be permissible for the taxpayer to include in his expenses and to deduct from gross income the total cost of such supplies and materials as were purchased during the taxable year for which the return is made, provided the taxable income is clearly reflected by this method.

Section 1.162-3, Income Tax Regs., provides for the deferred expense treatment of nonincidental supplies without regard to the taxpayer's overall method of accounting.

IV. Discussion

A. Purchases and Sales of Inventory

1. Respondent's Pleading

Petitioner expended $772,522 for chemotherapy drugs during 1995 and treated that expenditure as an expenditure for incidental supplies. That was plain error under section 1.162-3, Income Tax Regs. See concurring opinion of Judge Beghe at 32. Respondent treated the expenditure as if it constituted the cost of goods purchased for resale. On the facts of this case, in terms of accounting for the cost of the chemotherapy drugs, it makes no difference whether the $772,522 expended for chemotherapy drugs is treated as the cost of goods held for resale or as a deferred expense.[4]

The only issue open to debate is whether respondent can compel petitioner to account for amounts billed to Medicare (and to patients) under an accrual method. Although section 1.446-1(c)(2)(ii), Income Tax Regs., leaves no doubt that the Secretary can so compel petitioner if purchases and sales of inventory are involved, nothing in section 446(b) prohibits the Secretary from

---

[4] The notice of deficiency shows a $0.00 sec. 481 adjustment.

so compelling petitioner if purchases and sales of inventory are not involved. Section 446(c) specifically permits a taxpayer to compute taxable income under the cash method; nevertheless, that permission is made subject to the Secretary's section 446(b) authority to reject the taxpayer's method of accounting. See sec. 446(c). By the pleadings, however, the parties have limited what petitioner must prove to stay on the cash method.

Above, in section II., I have set forth both respondent's explanation of the net adjustment and his allegation, in response to petitioner's averment that it is entitled to use the cash method, that "petitioner is required to maintain inventories and, therefore, is required to use the accrual method for the purchase and sale of inventories." (Emphasis added.) Correctly, the majority thinks that a fair reading of the issue for trial in this case, as framed by the pleadings, is whether petitioner is required to maintain inventories. I agree with the limited scope of the majority's inquiry, in this case. I do not agree, however, that petitioner need not use inventories.

### 2. Inventories Are Required

As set forth in section III., supra, regulations provide: (1) Inventories are necessary in every case in which the sale of merchandise is an income-producing factor, and (2) with limited exceptions, in any case in which it is necessary to use an inventory, an accrual method must be used with regard to purchase

and sales.  See secs. 1.446-1(c)(2), 1.471-1, Income Tax Regs.

Thus, generally, if the purchase and sale of merchandise is an

income-producing factor, an accrual method must be used with

regard to such purchases and sales.

The nominal focus of the majority's inquiry is whether the

chemotherapy drugs are merchandise:  "We focus our inquiry on

whether the chemotherapy drugs were supplies deductible under

section 162, or merchandise that must be inventoried under

section 471."  Majority op. p. 10.  The majority states:

"Respondent's characterization of the chemotherapy drugs as

merchandise offends the natural and ordinary meaning of the term

'merchandise'".  Id. at 17.  The majority concedes, however:

"Although pharmaceuticals could reasonably be construed to be

merchandise in some contexts; * * * it does not necessarily

follow that pharmaceuticals are merchandise in all contexts."

Id.  The majority reaches the conclusion that the chemotherapy

drugs are not merchandise on the basis that petitioner "is not a

merchandiser", id. at 15, its business "is inherently a service

business", id. at 16, or "[s]imply put, petitioner is not

peddling products."  Id. at 18.   The majority's conclusions seem

to be informed by its view:  "A medical practice such as

petitioner's is inherently a service business, and the drugs

administered in the practice are subordinate to the provision of

the medical services."  Id. at 16.

3.  Conclusion of Law

The majority's conclusion that the chemotherapy drugs are not merchandise is not a finding of fact.  The majority's conclusion that the chemotherapy drugs are not merchandise appears to rely on a number of propositions that, when taken together, amount to a rule of law (i.e., a rule of general application).  The majority's view that a medical practice such as petitioner's is inherently a service business is dependent on a number of factors (some of which are conclusory):  "the uniqueness of the industry in which petitioner operates", the fact that petitioner's business is a "quintessential service business", the "inseparable connection" of the chemotherapy drugs to the performance of services, and, finally "[s]ervice income, by definition, does not include income from the sale of goods".  From those factors, the majority composes the following rule of law:  Doctors (medical and osteopathic) are not in trade.  The dictionary gives as one definition of trade:  "the business of buying and selling commodities; commerce."  The American Heritage Dictionary of the English Language 1897 (3d ed. 1992).  The majority believes that doctors are not in trade because they are members of a learned profession, whose stock in trade is knowledge, not goods or merchandise.  See majority op. p. 16.

The majority relies on Abbott Labs. v. Portland Retail Druggists Association, Inc., 425 U.S. 1 (1976), to support its

conviction that doctors are not in trade (i.e., are not merchants). Abbott Labs., however, is an antitrust case, in which the Supreme Court addressed purchases by nonprofit hospitals of pharmaceutical products at favored prices from the manufacturers of those products. The issue was the proper construction of the phrase "purchases of their supplies for their own use," as it appears in 52 Stat. 446, 15 U.S.C. sec. 13c (1994) (referred to by the Supreme Court as the "Nonprofit Institutions Act"). The precise question was whether the nonprofit hospitals' purchases in question were exempt from the proscription of the Robinson-Patman Antidiscrimination Act, ch. 592, 49 Stat. 1526 (1936), 15 U.S.C. secs. 13, 13a, 13b, and 21a (1994) because they were for the hospitals' own use, within the meaning of the Nonprofit Institutions Act. Abbott Labs. v. Portland Retail Druggists Association, Inc., supra at 4. The majority states: "The exemption generally applies where the nonprofit institution is purchasing the drugs for its 'own use' as opposed to for sale to patients." Majority op. p. 16 (emphasis added). Apparently, since, in Abbott Labs., the Supreme Court found that at least some of the drugs in question were purchased by the hospitals for their own use (within the meaning of 15 U.S.C. sec. 13c), the majority concludes that those drugs were not purchased for resale (which, I assume, leads to the conclusion that doctors, like the hospitals, are not

merchants).  The majority mischaracterizes a provision of the
Nonprofit Institutions Act, 15 U.S.C. sec. 13(c) (1994).  That
provision provides as follows:  "Nothing in the * * * Robinson-
Patman Antidiscrimination Act, shall apply to purchases of their
supplies for their own use by schools, colleges, universities,
public libraries, churches, hospitals, and charitable
institutions not operated for profit."  The provision does not
establish a dichotomy between use and sale, as suggested by the
majority.[5]  See, e.g., De Modena v. Kaiser Found. Health Plan,
Inc., 743 F.2d 1388, 1393 (9th Cir. 1983) (referring to Abbott

---

[5]  In Abbott Labs. v. Portland Retail Druggists Association,
Inc., 425 U.S. 1 (1976), each of the hospitals in question
operated a pharmacy, which was a separate department of the
hospital, and whose operations produced revenue in excess of
cost.  The pharmacies dispensed the pharmaceutical products in
question.  The Supreme Court used the terms "sales" and
"dispensations" with reference to those products, and without any
clear distinction between the two terms.  The Supreme Court
categorized the following dispensations as for the hospitals'
"own use":

1.  To the inpatient, or to the emergency facility patient,
upon his discharge and for his personal use away from the
premises.

2.  To the outpatient for personal use away from the
premises.

3.  To the hospital's physicians, employees, or students,
for their personal use or for the use of their dependents.

Clearly the third category, if not all three, constitutes
sales of merchandise by the pharmacies, notwithstanding that such
merchandise was acquired for the hospitals' own use.  Nothing in
the opinion indicates that the pharmacies failed to inventory
their pharmaceuticals.

Labs. v. Portland Retail Druggists Association, Inc., 425 U.S. 1 (1976), and holding:  "[D]rugs purchased by an HMO * * * for resale to its members are purchased for the HMO's 'own use' within the meaning of the Nonprofit Institutions Act and thus qualify for protection under the Act.").  Abbott Labs. is no support for the proposition that, as a matter of law, petitioner is not selling merchandise.

The majority also cites St. Luke's Hosp., Inc. v. Commissioner, 35 T.C. 236, 238 (1960), for the proposition that petitioner is not selling merchandise when it administers chemotherapy drugs.  The principal issue in St. Luke's Hosp., Inc. was whether the taxpayer, having requested and received permission from the Commissioner to change from an accrual method to the cash method of accounting for 1953 and thereafter, properly reported income on the cash method when it continued to employ primarily an accrual method in keeping its books and records.  We concluded that it did properly report income on the cash method since, notwithstanding the taxpayer's retention of an accrual method, its cash-basis income could readily be ascertained from its books and records.  Our findings of fact included the following:

> Petitioner owns and operates a hospital in Bluefield. Its business is the customary hospital service business.  It is not a merchandising business, and petitioner has no merchandise inventories which would require the use of an accrual method in keeping its books or reporting its income.  Its income is derived

> from providing hospital and professional care to the
> sick.  [Id. at 238.]

Those are not statements of law but findings of fact.  The

findings that the Bluefield hospital is in the customary service

business of hospitals and has no merchandise is not necessarily

applicable to petitioner.  Petitioner is not a hospital, but runs

a chemotherapy clinic, where chemotherapy drugs constitute both a

significant cost and a substantial source of revenue.  There is

no finding as to how significant drugs and similar items were to

the overall cost of treatment at the Bluefield hospital.  In St.

Luke's Hospital, Inc. v. Commissioner, supra, which dealt with

medicine as it was practiced over more than 40 years ago, the

Commissioner did not even suggest that inventories were required.[6]

It is no authority for any conclusion of law.

Nor can the majority rely on any rule of law that service

providers need never use inventories:  "We have previously

examined service transactions in a variety of industries to

determine whether the transactions in substance involved solely

the sale of a service, or whether the transactions involved the

sale of both a service and merchandise."  Majority op. p. 13.

---

[6]  In Abbott Labs. v. Portland Retail Druggists Association,
Inc., supra at 11, decided in 1976, the Supreme Court stated with
respect to nonprofit hospitals:  "we recognize * * * that the
concept of the nonprofit hospital and its appropriate and
necessary activity has vastly changed and developed since the
enactment of the Nonprofit Institutions Act in 1938."  Needless
to say, much more has changed in the last 23 years.

Finally, the majority's reliance on <u>Hospital Corp. of Am. v.</u> <u>Commissioner</u>, 107 T.C. 116 (1996), to support its proposition that petitioner's income is attributable solely to services and not to some combination of services and merchandise is puzzling. In <u>Hospital Corp. of Am.</u>, we did indeed find that, for purposes of section 448(d)(5), the use of medical supplies is part of the medical services furnished patients by the hospitals in question. See <u>id.</u> at 144. In the same breath, however, we found "the cost of those supplies is an incidental cost of the health care services provided by the hospitals." <u>Id.</u> Given that finding, the fact that <u>Hospital Corp. of Am.</u> involves a different section of the statute, and our specific reservation in <u>Hospital Corp. of Am.</u> that we were not deciding the question of whether the furnishing of medical supplies by the hospitals as a part of the rendering of services to their patients could be considered to be a sale of inventory, I do not consider that case as persuasive with respect to the issue before us today.

The majority cannot escape an examination of the particular facts of this case in light of the relevant provisions of law.

### 4. Finding of Fact

We find the instant setting distinguishable from the setting of those cases in which we have held that goods utilized by a service provider were merchandise for purposes for the inventory rules. We give significance to the uniqueness of the industry in which petitioner operates in relation to the other service industries we have addressed on this issue and bear in

mind the recent case of <u>Hospital Corp. of Am. v. Commissioner</u>, 107 T.C. 116, 143-145 (1996).* * *

Majority op. p. 14.

What facts distinguish this case from those cases in which we have held that goods utilized by a service provider were merchandise for purposes of section 1.471-1, Income Tax Regs.? I agree with the majority's observations that medicine is unique, and that it is inherently a service business. So what! Contrary to the majority's impression, health care providers do sell goods. See, e.g., <u>De Modena v. Kaiser Found. Health Plan, Inc.</u>, <u>supra</u> (drugs purchased by an HMO for resale to its members are purchased for the HMO's own use). The relevant distinction is between <u>supplies</u>, for which inventories need not be taken, and <u>merchandise held for sale</u> (merchandise), for which inventories must be taken. Compare section 1.162-3, Income Tax Regs., with section 1.471-1, Income Tax Regs. I agree with the majority when it states: "The statute and regulations do not define the words 'merchandise' or 'inventory', nor do they clearly distinguish between 'inventory' and 'materials and supplies' that are not actually consumed and remain on hand." Majority op. p. 12. As previously discussed, <u>supra</u> section IV.A.1, it was plain error for petitioner to treat the expenditure for the chemotherapy drugs as an expenditure for incidental supplies, and, in terms of properly accounting for that expenditure, it makes no difference whether the expenditure is treated as being for merchandise or

for supplies.  The relevant difference is with respect to the application of section 1.446-1(c)(2)(i), Income Tax Regs., which, with an exception not here relevant, and taking into account section 1.471-1, Income Tax Regs., requires an accrual method with regard to purchases and sales of merchandise.  The majority agrees that the distinction between supplies and merchandise does not turn on the nature of the underlying commodity: "pharmaceuticals could reasonably be construed to be merchandise in some contexts".  Majority op. p. 17.  In Wilkinson-Beane, Inc. v. Commissioner, 420 F.2d 352, 354 (1st Cir. 1970), affg. T.C. Memo. 1969-79, the Court of Appeals for the First Circuit determined that the meaning of the term "merchandise", as used in section 1.471-1, Income Tax Regs., "must be gathered from the context and the subject."  The context and the subject are the explicit requirement that a taxpayer's method of accounting clearly reflect income.  See sec. 446(b).  Income realized from the sale of merchandise is most clearly measured by matching the cost of that merchandise with the revenue derived from its sale. Knight-Ridder Newspapers, Inc. v. United States, 743 F.2d at 789. Given the lack of any clearly pertinent distinction between the term "supplies" and the term "merchandise", where the facts raise some question (as they do here), we should inquire which classification results in a clearer reflection of the taxpayer's income.

The majority describes as seminal the opinion of the Court of Appeals for the First Circuit in Wilkinson-Beane, Inc. v. Commissioner, supra. The taxpayer in Wilkinson-Beane, Inc. was an undertaking establishment, which argued the primacy of the services that it provided to its customers. The Court of Appeals affirmed the finding of the Tax Court that the taxpayer was selling merchandise. The Court of Appeals stated:

> We fully recognize that petitioner was in the business or providing valuable services. But we think it would be anomalous to hold that a taxpayer in a service business can have no merchandise even though he derives a substantial portion of his income from the regular purchase and sale of tangible personal property. We certainly have no basis for so restricting the application of the word 'merchandise'. * * * Since the caskets play a central role in the 'sale' of taxpayer's service, to use its term, we see no error in the determination that the caskets were merchandise.

Id. at 355. The Court of Appeals' inquiry into the centrality of the property to the sale and the substantiality of the income attributable to the property has been followed in subsequent cases. For example, in J.P. Sheahan Associates, Inc. v. Commissioner, T.C. Memo. 1992-239, we determined whether roofing materials constituted merchandise, and we looked to whether the materials were shown separately on the customer's bill, they represented a substantial amount of the total bill, and they were marked up. In Thompson Elec., Inc. v. Commissioner, T.C. Memo. 1995-292, which involved an electrical contractor, we said: "If the cost of material a taxpayer uses to provide a service is

substantial compared to its receipts, the material is a substantial income-producing factor even if the taxpayer does not markup the prices charged to its customers for the material." What I distill from the <u>Wilkinson-Beane, Inc.</u> line of cases is that, where the question is whether a provider of services is using supplies or selling merchandise, the answer turns on whether the commodity in question is a substantial and identifiable source of revenue.  If so, and if the merchandise is an income-producing factor, than such merchandise must be inventoried and an accrual method is appropriate (and may be required) to match costs and revenue.  On the facts before us, I would require inventories because petitioner is selling merchandise that is an income-producing factor.

The majority's finding that the chemotherapy drugs are subordinate to the services rendered ignores the substantiality and centrality of the income attributable to the chemotherapy drugs and involves conclusions that have no basis in the record. The only facts stipulated with respect to the medical aspects of petitioner's business are set forth in the margin.[7]  Petitioner is

---

[7]  When an individual first becomes a patient of petitioner, one of petitioner's physicians examines the patient in order to determine the proper chemotherapy treatment for that patient.

When a patient has been evaluated and a chemotherapy regime has been prescribed, the patient begins regular, periodic treatments.

(continued...)

a corporation, operating clinics and employing physicians, nurses, nursing assistants, laboratory technicians, administrative personnel, and office workers.  The parties have not stipulated how individuals came to be petitioner's patients. Given petitioner's apparent specialization, it is likely that patients were referred for chemotherapy drug treatment.  Nothing in the record establishes the majority's findings that "patients played no role in determining the type or amount of drugs used on them", majority op. p. 19, or that patients must "agree to petitioner's overall chemotherapy service, and, when they do agree to this service, they have no say in the type or quantity

---

[7](...continued)
Petitioner's physicians prescribed the chemotherapy regime but, with rare exception, did not actually administer the chemotherapy drugs to patients during taxable year 1995 to present.

Chemotherapy drugs were administered by oncology nurses during taxable year 1995.

Prior to the initiation of each course of chemotherapy, the patients were seen and evaluated by the attending physician.

The patients were not examined at the time of every chemotherapy administration pursuant to the standard practice of medical oncology.

Once a patient has begun a chemotherapy regime, that patient will see one of petitioner's physicians approximately every 4- to 6-weeks, between treatments.

While a physician must be available to respond to emergencies, a physician is not required to be in every room with a patient while chemotherapy treatment is being administered.

of chemotherapy drugs which petitioner uses in their care."
Majority op. p. 15. Nor does anything in the record establish:
"Usually, they [patients] are not even aware of the type or
quantity of chemotherapy drugs used on them as part of their
treatment." Id. Contrary to the inference in the majority's
opinion, petitioner's physician-employees do not choose or decide
that a patient shall receive chemotherapy drugs. Common
experience tells us that, although petitioner's physician-
employees may recommend such treatment, the patients are the ones
who must make the decision to receive the drugs. Moreover, if
those patients decide to receive chemotherapy drugs, they want
the drugs and nothing in the record (or in common sense) leads me
to believe that the drugs are necessarily subordinate to the
physician's services. I cannot agree with the majority's
conclusion that, with respect to petitioner's business, the
provision of chemotherapy drugs was subordinate to the provision
of medical services.

B. Clear Reflection of Income

If a taxpayer's method of accounting does not clearly
reflect income, section 446(b) accords the Secretary the
authority to require the taxpayer to compute taxable income under
such method as, in the opinion of the Secretary, does clearly
reflect income. We have interpreted respondent's position in
this case as requiring petitioner to use an accrual method (the

hybrid method) only because purchases and sales of inventory were involved. Having concluded that petitioner did not purchase and sell inventory, the majority has determined that respondent abused his discretion in requiring petitioner to use the hybrid method. Taxpayers should not read too much into that determination.

As stated, although section 1.446-1(c)(2)(ii), Income Tax Regs., leaves no doubt that respondent can so compel petitioner if purchases and sales of inventory are involved, nothing in section 446(b) prohibits the Secretary from so compelling petitioner if purchases and sales of inventory are not involved. Moreover, although section 446(c) specifically permits a taxpayer to compute taxable income under the cash method, that permission is made subject to the Secretary's section 446(b) authority to reject the taxpayer's method of accounting. See sec. 446(c). The legislative endorsement of the cash method undoubtedly means that wages and salaries can be reported on the cash method. The taxpayer in this case, however, is not a wage earner. Petitioner is a corporation, with three physician-shareholder-employees, three other physician-employees, numerous other employees, and, for 1995, just shy of $3 million in receipts. For that year, it paid officer compensation of $600,328 and other salaries and wages of $630,381, for a total of just over $1.2 million. If the value of the services provided by all six physicians employed by

petitioner is measured by their compensation, then that value is somewhere in the neighborhood of $1 million (given that there were numerous employees other than physician employees). Petitioner, thus, had receipts of about $2 million attributable to something other than the negotiated value (to the corporation) of physician's services, including chemotherapy drugs costing $772,522. Petitioner's receivables at the end of 1995 were $148,557. I know of no rule of law that forecloses an inquiry into whether, to reflect clearly petitioner's income, the receivables attributable to the chemotherapy drugs used during the year should not be reported on an accrual method, as would be the case under the hybrid method. Recently, in Oakcross Vineyards, Ltd. v. Commissioner, T.C. Memo. 1996-433, affd. 142 F.3d 444 (9th Cir. 1998), we sustained the Commissioner's determinations that (1) the cash method did not clearly reflect a farmer's receipts from the sale of grapes and (2) an accrual method was required. We surveyed many of the cases dealing with a challenge by the Commissioner to the cash method, including cases involving the Commissioner's rejection of the cash method for reporting receipts. Among the cases we surveyed were the following: American Fletcher Corp. v. United States, 832 F.2d 436 (7th Cir. 1987) (credit card charge account service required to change from cash method to an accrual method); Applied Communications, Inc. v. Commissioner, T.C. Memo. 1989-469

(concerning sales of computer software by the developer of the software and taking into account that "cash method of accounting is not appropriate for petitioner because it generates substantial amounts of receivables or deferrals of revenue as evidenced by the difference between its software income for tax and financial purposes."); Silberman v. Commissioner, T.C. Memo. 1983-782 (cash receipts and disbursements method of accounting could not be used by a movie production partnership because the predicted delay between expenditures and receipts created a mismatching of funds and a distortion of income), affd. without published opinions sub nom. Appeal of David Whin, Inc., Appeal of Giordano, Appeal of Malanka, Stamato v. Commissioner, 770 F.2d 1068, 1069, 1072, 1075 (3d Cir. 1985). In Oakcross Vineyards Ltd., we also pointed out that the question of whether a taxpayer's method of accounting materially distorts or clearly reflects income is one of fact and is to be resolved on a case-by-case basis.

As previously stated, where the Commissioner has determined that a taxpayer's method of accounting does not clearly reflect income, the taxpayer must demonstrate either that his method of accounting clearly reflects income or that the Commissioner's method does not clearly reflect income. Respondent's explanation of the net adjustment in the notice is broader than the ground he relies on in the answer. That narrowing of his ground in the

answer may not have been intended.  Taxpayers similarly situated to petitioner should be prepared to demonstrate that the cash method clearly reflects their income or that the hybrid method does not.[8]

V.  Conclusion

For the foregoing reasons, I dissent from the majority's opinion.

COHEN, WHALEN, and CHIECHI, JJ., agree with this dissent.

---

[8]  Taxpayers may have difficulty in proving that a method of accounting such as the hybrid method does not clearly reflect income.  In Hospital Corp. of Am. v. Commissioner, T.C. Memo. 1996-105, we concluded that certain hospitals' use of a hybrid method of accounting that reported on an accrual method revenue allocable to charges for supplies and pharmaceuticals clearly reflected the hospitals' income