T.C. Memo. 2000-130


UNITED STATES TAX COURT


MID-DEL THERAPEUTIC CENTER, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

D. RICHARD ISHMAEL, M.D., PC, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 9060-97, 9270-97.          Filed April 11, 2000.


<u>Bruce A. Moates</u> and <u>LeRoy D. Boyer</u>, for petitioners.

<u>Elizabeth Downs</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, <u>Judge</u>:  Respondent determined a deficiency of

$211,979 in petitioner D. Richard Ishmael, M.D., PC's 1995

Federal income tax, and a deficiency of $140,025 in petitioner

Mid-Del Therapeutic Center, Inc.'s Federal income tax for the

taxable year ended April 30, 1995.  Both petitioners petitioned

the Court to redetermine the respective deficiencies.  These cases were consolidated for purposes of trial, briefing, and opinion because they involve common questions of law and fact.

The deficiencies result from respondent's determination, pursuant to section 446(b),[1] that petitioners must use an accrual method of accounting to report their taxable income.  The ultimate issue to be decided is whether respondent abused his authority under section 446(b) by requiring petitioners to change from the cash receipts and disbursements method of accounting (the cash method) to the accrual method.  In order to decide that issue, we must examine the related question of whether chemotherapy drugs and related medications (the drugs), administered by petitioners to patients during the course of medical treatments, are merchandise which must be inventoried.  We hold that the drugs in question are not merchandise and that respondent abused his discretion under section 446(b) by requiring petitioners to change from the cash method to the accrual method of accounting.

---

[1]All section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  For convenience, all monetary amounts have been rounded to the nearest dollar.

FINDINGS OF FACT

Some of the relevant facts have been stipulated and are so found.  The stipulation of facts is incorporated herein by this reference.

Petitioner Mid-Del Therapeutic Center, Inc. (Mid-Del), and petitioner D. Richard Ishmael, M.D., PC (PC), are Oklahoma corporations,[2] each of which operates a chemotherapy clinic in the Oklahoma City metropolitan area (collectively, the clinics). On the dates the petitions in these consolidated cases were filed, the principal place of business of Mid-Del was in Midwest City, Oklahoma, and the principal place of business of PC was in Oklahoma City, Oklahoma.  Dr. D. Richard Ishmael, an oncologist, owns 100 percent of the stock of both Mid-Del and PC.  PC is Dr. Ishmael's personal service corporation, and Mid-Del is a subchapter C corporation, owned and managed by Dr. Ishmael.

The Clinics in General

Petitioners' clinics have provided outpatient chemotherapy treatment to Dr. Ishmael's patients since 1988.  Prior to 1988, Dr. Ishmael administered chemotherapy treatments to patients in hospitals on an inpatient basis.  By 1988, various drugs had been developed to mitigate the severe nausea associated with

---

[2]Mid-Del was incorporated in 1991, and PC was incorporated in 1982.

chemotherapy.  These drugs enabled patients to receive chemotherapy treatments on an outpatient basis.  When Medicare decided not to pay for inpatient chemotherapy under most circumstances, that decision effectively forced chemotherapy out of hospitals and into outpatient clinics.

During the period in issue, PC employed a staff of employees consisting of nurses, nursing assistants, laboratory technicians, physician assistants, administrative clerks, pharmacists, pharmacy technicians, and office maintenance workers.  Mid-Del had no employees, but instead used contract nursing services leased through the Cancer Care Network and paid a common paymaster for doctors' services and other labor costs.  PC provided administrative services, including bookkeeping and billing, for both clinics.  Mid-Del paid PC an annual fee for these administrative services.

Treatment of Patients

Many local doctors referred patients to the clinics for treatment of cancer, lupus, AIDS, and some types of arthritis. Dr. Ishmael scheduled 2 days a week to see patients at each of the clinics.  As a general rule, he saw patients at the PC clinic on Mondays and Wednesdays and at the Mid-Del clinic on Tuesdays and Thursdays.  The clinics' hours were Monday through Friday, from 8 a.m. to 5 or 6 p.m.  Chemotherapy treatments were administered at both clinics 5 days a week.

On a patient's first visit, Dr. Ishmael examined the patient in order to determine the proper chemotherapy treatment (if any) for that patient. When Dr. Ishmael prescribed a chemotherapy treatment, his order for the patient's individualized chemotherapy treatment was recorded in the patient's file, which was maintained at the clinic where that patient received treatment. Once a patient was evaluated and a chemotherapy regimen had been prescribed, the patient began regular, periodic treatments, which could continue for several months or years. Dr. Ishmael wrote prescriptions for any drugs a patient needed that were not administered by the clinics.

Once a patient began a chemotherapy regimen, that patient would see Dr. Ishmael approximately every 4 to 6 weeks for reevaluation. However, patients generally did not see Dr. Ishmael each time they came to the clinic for treatment. While a doctor had to be available in the office to respond to medical emergencies during working hours, one was not required to be present in the treatment room while a chemotherapy treatment was being administered. When Dr. Ishmael was not available, arrangements with other physicians ensured the availability of a physician in the event of an emergency.

Prior to every chemotherapy treatment, a patient had blood tests, which were performed at the clinics upon the patient's arrival. A nurse drew the blood to be tested, and a lab

technician performed the tests at the in-office lab.  Blood tests were performed in order to insure that the patient was not too ill to receive the chemotherapy treatment.  If a patient's blood count indicated that the patient was too ill for the prescribed treatment, a nurse would contact Dr. Ishmael, who then might prescribe a reduced dosage.  When the test results indicated a patient could receive his chemotherapy safely, the pharmacist was notified to prepare the appropriate chemotherapy treatment for the patient, as previously prescribed by Dr. Ishmael.  Mid-Del sent its orders for preparation of chemotherapy treatments to the pharmacist at the PC clinic by fax machine and received the prepared treatments from the PC pharmacist via courier service.

Registered nurses administered the chemotherapy treatments and provided extensive counseling and education to patients regarding their treatments.  The nurses spent a large amount of time counseling patients because of the profound psychological effects of chemotherapy treatments.  Administration of a chemotherapy treatment to a patient generally took 2 to 8 hours. A few patients were equipped with an apparatus which slowly administered their treatment over a period of days.  Other patients received drugs that required the nurse to sit with the patient throughout the treatment and closely monitor the administration of the drug and the reaction of the patient.  Dr.

Ishmael frequently adjusted a patient's chemotherapy treatment in accordance with the patient's response to the treatment.

The Chemotherapy Drugs and Ancillary Medications Used in Treatments

After a chemotherapy drug has been tested and scientifically proven effective to treat a particular condition, it is approved for use by the Food and Drug Administration. Once a drug is approved, it can be used to treat conditions other than those for which it is approved because chemotherapy drugs may be effective against multiple forms of cancer. For example, a drug approved for use against ovarian cancer might be used to treat lung cancer, even though its use to treat lung cancer is not an approved use. Petitioners were not reimbursed by Medicare for their use of approved drugs if the condition for which the drug was administered was not an approved use, on the grounds that such treatments were experimental.

Dr. Ishmael treated some of his patients with drugs that were not approved for a particular condition when he believed the drug would help those patients, even though he knew that Medicare or nongovernmental health insurance carriers (private insurers) would not pay for costs associated with experimental treatments. Although petitioners bore the cost of these treatments, Dr. Ishmael authorized the treatments when he felt that they were

appropriate because his overriding concern was the welfare of his patients.[3]

Dr. Ishmael, petitioners' staff, and petitioners' patients viewed the chemotherapy treatments, and the drugs used in those treatments, as medical services, not as the purchase and sale of drugs.

The Pharmacy

PC maintained an onsite pharmacy, where chemotherapy drugs purchased by both PC and Mid-Del were stored and where a pharmacist employed by PC mixed and prepared chemotherapy treatments; i.e., mixtures of chemotherapy drugs in prescribed amounts, for both clinics. Chemotherapy drugs purchased by Mid-Del were accounted for separately and held in a separate area from chemotherapy drugs purchased by PC. Mid-Del paid PC a monthly fee for PC's provision of pharmacy services to Mid-Del.

Petitioners used approximately 85 different chemotherapy drugs to treat patients. Generally, petitioners attempted to keep a 2-week supply of each drug on hand, although some chemotherapy drugs were ordered on an as-needed basis. Petitioners sometimes stocked up on a newly approved chemotherapy

---

[3]For example, Dr. Ishmael prescribed an experimental drug, Taxotere, for a patient dying of lung cancer. The patient had been doing very poorly and was getting ready to enter a hospice program, but Dr. Ishmael persuaded her family to allow him to provide the treatment. Treatment continued despite a cost to the clinic of $10,000 per week. The treatment was successful.

drug if they had a patient population that would benefit from that drug.

PC's computer system kept a constantly updated record of each clinic's stock of chemotherapy drugs and ancillary pharmaceuticals. Drug orders were placed automatically and electronically by computer when the onhand quantity of a particular drug dropped to a predetermined minimum balance. Petitioners' software only tracked drugs.

The shelf lives for chemotherapy drugs varied from about 6 months to 1 year in an unmixed state. A mixed or prepared chemotherapy treatment generally had to be used within 3 to 24 hours.

Billing and Reimbursement

Each time a patient visited a clinic for treatment, a nurse completed a charge sheet. The charge sheet was then used to bill the patient or the party primarily responsible for payment. The charge sheet indicated the patient's diagnosis and the amounts of chemotherapy drugs administered, as well as any other medications or procedures used in treating the patient on that day. After the patient's treatment for that day was complete, the charge sheet was forwarded to the billing department at PC to determine the amount to be charged or billed.

Most clinic patients had Medicare or private insurance coverage. For such patients, petitioners filed for payment

directly with Medicare or the insurance company.[4]  Thus, most
bills were submitted to Medicare or private insurers.

In accordance with Medicare regulations and private
insurers' requirements, the submitted bills reflected the
specific drugs, and amounts thereof, administered to each
patient.  Each compensable service and drug provided in the
course of chemotherapy treatment was assigned a specific code for
billing purposes.  The billing code for a particular chemotherapy
drug was referred to as its "J-code", which corresponded to a
specific drug and a specific amount of that drug.  A
miscellaneous J-code was used for drugs that had not been
assigned a specific J-code.

Petitioners' charges for chemotherapy drugs were based on
the drugs' average wholesale price (AWP), which was determined by
reference to the "Red Book", a publication that PC received
annually.  To determine the amount charged for each drug, the
billing department multiplied the AWP by a certain multiple,
which varied depending upon whether the bill was being submitted
to a private insurer or Medicare.  On the other hand, although
AWP was the starting point used to calculate the charges made for

---

[4]Only "Medicare providers" may bill Medicare directly.
Prior to 1995, petitioners were not "Medicare providers" and,
therefore, billed the patients directly.  The patients then
submitted their bills to Medicare for reimbursement.  In 1995,
petitioners were "Medicare providers" and billed Medicare
directly for medical services provided to covered patients.

chemotherapy drugs for both Medicare and private insurers, the reimbursement policies of the private insurers changed frequently, affecting the amount that petitioners actually collected and the predictability of the billing and collection process.

Petitioners' bills also included charges for Dr. Ishmael's professional services,[5] administration of the chemotherapy treatments, other supplies, miscellaneous medications, and laboratory items.

Determinations regarding reimbursement of charges were made by Medicare and private insurers on an item-by-item basis. Medicare and the insurance companies took similar positions regarding some items. For example, neither Medicare nor the insurance companies paid for unapproved chemotherapy treatments. Thus, petitioners were reimbursed for chemotherapy drugs used during chemotherapy treatments only if the drug administered to the patient had been approved for that specific therapeutic purpose.

The reimbursement policies of Medicare and the private insurers with respect to other items differed. For example, the extra cost incurred by petitioners for a staff pharmacist to mix the chemotherapy treatments was not specifically reimbursed by

_____

[5]Mid-Del did not bill patients or insurers for Dr. Ishmael's professional services. Instead, PC billed patients and insurers for all of the doctor's services, wherever provided.

Medicare.  Medicare did not reimburse petitioners for nondrug supplies used in administering treatments.  Some private insurers, however, did cover these charges.

With respect to chemotherapy drugs, petitioners' claims for reimbursement included only charges for chemotherapy drugs prepared from petitioners' own supply and administered by petitioners' nursing staff to the patient.

When petitioners received a payment from Medicare or an insurance company, they also received an "Explanation of Benefits" (EOB), which detailed amounts allowed and disallowed as to each specific charge and amounts due (copay amounts) from secondary insurance or the patient as to each specific charge. Petitioners routinely wrote off disallowed charges as they received EOB's from the insurance companies.  Petitioners wrote off the disallowed charges because agreements with the insurance companies prevented petitioners from seeking payment for those charges from the patients directly.  Copay amounts were not written off as long as the patient continued to receive treatments, even if the patient was indigent or full payment was not otherwise expected.  Petitioners kept daily, monthly, and annual summaries of charges, reimbursements, and writeoffs.

When PC's billing office determined from an EOB that an allowable charge had been disallowed, a corrected bill or explanation was submitted, and the writeoff of the disallowed

amount would be delayed until a revised EOB was received.  A substantial percentage of the claims filed by petitioners with Medicare and other insurance companies was rejected the first time and had to be resubmitted.

Some patients who did not have any medical insurance coverage or who could not afford their copayments were treated at the clinics.  Dr. Ishmael expected these patients to pay whatever they could afford.  The business office usually tried to work out some sort of payment schedule, even if the payment would only cover a small portion of the cost of treatment.  No attempt was made to charge only what a patient could afford or to write down an account in expectation of what ultimately might be collected. Eventually, if an account showed no activity for an extended period of time because a patient had died, left the area, or other circumstances indicated that the account was wholly worthless, petitioners wrote off the entire account.

Neither petitioner had signs in its clinics that indicated payments should be arranged before services were rendered. Petitioners never charged interest or finance charges on patient accounts.  At least in part because of the patients' medical conditions, petitioners did not use aggressive collection practices.

Accounting Issues–Background

It is a customary and accepted practice in the health care industry for health care practitioners to use the cash method of accounting. PC used the cash method of accounting for both income tax purposes and for bookkeeping purposes and consistently reported the drugs used in patient treatments as supplies and not as inventory. With the exception of its Federal income tax return for 1993, Mid-Del used the cash method of accounting for income tax purposes and consistently reported the drugs used in patient treatments as supplies and not as inventory. Mid-Del used the accrual method of accounting for bookkeeping purposes.

PC reported the following gross receipts, direct costs associated with patient treatments, and gross profit for the taxable years ending April 30, 1993, 1994, and 1995, using the cash method of accounting:

| TYE | Gross receipts[1] | Other costs | Gross profit | Medical supplies and drugs included in other costs | Medical supplies and drugs as a percentage of gross receipts |
|---|---|---|---|---|---|
| 04/30/93 | $1,519,988 | $425,554 | $1,094,434 | $183,136 | 12 |
| 04/30/94 | 2,106,670 | 454,982 | 1,651,688 | 367,793 | 17 |
| 04/30/95 | 2,100,440 | 513,006 | 1,587,434 | 451,976 | 22 |

[1] Net of returns and allowances.

Mid-Del reported the following gross receipts, direct costs associated with patient treatments, and gross profit for 1993, 1994, and 1995, using the cash method of accounting:

| TYE | Gross receipts[1] | Other costs | Gross profit | Medical supplies and drugs included in other costs | Medical supplies and drugs as a percentage of gross receipts |
|---|---|---|---|---|---|
| 1993 amended[2] | $1,849,403 | $643,959 | $1,205,444 | unknown | unknown |
| 1994 | 2,469,928 | 806,510 | 1,663,418 | $806,510 | 33 |
| 1995 | 1,780,767 | 721,944 | 1,058,823 | 721,994 | 41 |

[1] Net of returns and allowances, for 1994 and 1995.

[2] Mid-Del originally reported its income for 1993 using an accrual method of accounting. During an audit of its 1993 Federal income tax return, Mid-Del submitted an amended return reporting its income and expenses for 1993 using the cash method of accounting. The audit was closed by agreement using the figures reflected on the amended return.

The combined average annual gross receipts of both petitioners for the 3 years ending with the taxable years in issue was less than 5 million dollars.

For accounting purposes, Mid-Del and PC each valued their chemotherapy drugs and miscellaneous medications at actual cost. As of taxable years ending April 30, 1994, and April 30, 1995, PC's drugs on hand were valued at $44,593 and $42,143, respectively. As of December 31, 1994, 1995, and 1996, Mid-Del's drugs on hand were valued at $37,273, $60,382, and $67,634, respectively.

Neither petitioner made any attempt to manipulate income or expenses by deferring income or paying unnecessary expenses at the end of the taxable year.

- 16 -

The Notices of Deficiency

Following an audit, respondent issued notices of deficiency to each of the petitioners in which respondent determined that they must use the accrual method.  The notices of deficiency described respondent's determination as follows: "It is determined the accrual method of accounting more clearly reflects income than your current 'Cash Basis' method of accounting."

OPINION

Section 446(b) vests the Commissioner with broad discretion in determining whether a particular method of accounting clearly reflects income.  See Knight-Ridder Newspapers, Inc. v. United States, 743 F.2d 781, 788 (11th Cir. 1984); Ansley-Sheppard-Burgess Co. v. Commissioner, 104 T.C. 367, 370 (1995); RLC Indus. Co. v. Commissioner, 98 T.C. 457, 491 (1992), affd. 58 F.3d 413 (9th Cir. 1995).  The Commissioner's determination is entitled to more than the usual presumption of correctness.  See Ansley-Sheppard-Burgess Co. v. Commissioner, supra; RLC Indus. Co. v. Commissioner, supra.  Accordingly, the Commissioner's interpretation of the "clear-reflection standard [of section 446(b)] 'should not be interfered with unless clearly unlawful.'" Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 532 (1979) (quoting Lucas v. American Code Co., 280 U.S. 445, 449 (1930)). The taxpayer bears "a 'heavy burden of * * * [proof],'" and the Commissioner's determination "is not to be set aside unless shown

to be 'plainly arbitrary.'"  Id. at 532-533 (quoting Lucas v. Kansas City Structural Steel Co., 281 U.S. 264, 271 (1930)). The Commissioner's determination that a taxpayer's method of accounting does not clearly reflect its income is given great deference by this Court, but the Commissioner may not require a taxpayer to change from an accounting method which clearly reflects income to an alternate method of accounting merely because the Commissioner considers the alternate method to more clearly reflect the taxpayer's income.  See Ansley-Sheppard-Burgess Co. v. Commissioner, supra at 371.

The issue of whether the taxpayer's method of accounting clearly reflects income is a question of fact to be determined on a case-by-case basis.  See id.  In reviewing the Commissioner's determination that the taxpayer's method of accounting does not clearly reflect income, the function of the Court is to determine whether there is an adequate basis in law for the Commissioner's conclusion.  See RCA Corp. v. United States, 664 F.2d 881, 886 (2d Cir. 1981).  Consequently, to prevail, a taxpayer must prove that the Commissioner's determination was arbitrary, capricious or without sound basis in fact or law.  See Knight-Ridder Newspapers, Inc. v. United States, supra; Ansley-Sheppard-Burgess Co. v. Commissioner, supra.

Sec. 471(a) provides:

SEC. 471.  GENERAL RULE FOR INVENTORIES.

(a) General Rule.--Whenever in the opinion of the Secretary the use of inventories is necessary in order

clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer on such basis as the Secretary may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income.

By regulation, the Secretary has determined that inventories are necessary in every case in which the production, purchase, or sale of merchandise is an income-producing factor in the taxpayer's business. See sec. 1.471-1, Income Tax Regs. Unless otherwise authorized by the Commissioner, a taxpayer who is required to maintain inventories must use an accrual method of accounting with regard to purchases and sales of inventory. See Asphalt Prods. Co. v. Commissioner, 796 F.2d 843, 849 (6th Cir. 1986), affg. in part and revg. in part Akers v. Commissioner, T.C. Memo. 1984-208, revd. on another issue 482 U.S. 117 (1987); sec. 1.446-1(c)(2)(i), Income Tax Regs.

Respondent argues that the drugs at issue in this case are merchandise, the purchase and sale of which are income-producing factors in petitioners' businesses, and, therefore, petitioners are required to use the accrual method of accounting to report their taxable income.[6] Petitioners take exception to respondent's characterization of the drugs, countering that the drugs are supplies used in the course of treating patients, with the result

[6]Respondent does not argue in this case that Mid-Del failed to satisfy the book consistency requirement. See sec. 446(a). Respondent's arguments are directed solely to whether Mid-Del had inventories within the meaning of sec. 471.

that, under their view, the regulations requiring use of the accrual method are inapplicable. We agree with petitioners that their drugs are not merchandise.

The term "merchandise" as used in section 1.471-1, Income Tax Regs., encompasses goods purchased in condition for sale, goods awaiting sale, articles of commerce held for sale, and all classes of commodities held for sale. See Wilkinson-Beane, Inc. v. Commissioner, 420 F.2d 352, 354-355 (1st Cir. 1970), affg. T.C. Memo. 1969-79. Thus, items are merchandise if held for sale. See id.

We recently held in a Court-reviewed opinion that chemotherapy and other drugs, when used in the course of treating patients, are not held for sale and, therefore, are not merchandise. See Osteopathic Med. Oncology & Hematology, P.C. v. Commissioner, 113 T.C. 376 (1999). In Osteopathic Med. Oncology & Hematology, P.C., our holding was premised on our conclusion that the chemotherapy drugs and ancillary medications were both inseparable from the medical services provided to patients by the taxpayer and subordinate to the medical services provided. See id. at 384-385.

As in Osteopathic Med. Oncology & Hematology, P.C., the furnishing of drugs and other medical supplies in this case is inseparable from and subordinate to the medical services provided by petitioners to their patients. See id. Patients come to the clinics to receive medical treatment from Dr. Ishmael, not to

purchase drugs per se.  The drugs are administered to patients during the course of their treatment.  At no point during the treatment process does a patient acquire title to the drugs or exercise control over them.  A patient does not direct how or when the drugs are administered, nor can a patient simply purchase the drugs for self-treatment.  Upon completion of each treatment, there is nothing left for a patient to acquire, sell, or otherwise exert ownership rights over.  Although there are some factual differences between this case and Osteopathic Med. Oncology & Hematology, P.C., the key operational facts for purposes of our determination of whether petitioners' chemotherapy drugs constitute merchandise are virtually identical.  We hold that this case is controlled by Osteopathic Med. Oncology & Hematology, P.C. and that, therefore, for purposes of section 1.471-1, Income Tax Regs., petitioners' chemotherapy drugs are not merchandise.

Respondent's determinations in the notices of deficiency regarding petitioners' use of the accrual method do not state that the determinations were premised on respondent's conclusion that the chemotherapy drugs are merchandise.[7]  On brief, however,

---

[7]Other than respondent's argument that the drugs used by petitioners are inventory requiring use of the accrual method, respondent has not posited any reason why petitioners' use of the cash method does not clearly reflect income.  In fact, respondent's determination in the notices of deficiency in this case, read literally, is only that the accrual method "more clearly reflects income than your current 'Cash Basis' method of accounting."  Implicit in respondent's determination as phrased

(continued...)

respondent's argument as to why petitioners are required to use the accrual method is based solely on his position that the drugs used by petitioners are merchandise that must be inventoried. Respondent does not dispute that petitioners' use of the cash method clearly reflects income to the extent that the drugs are not merchandise. Because we hold that petitioners' drugs are not merchandise, it follows that petitioners are neither required to maintain inventories with respect to their drugs by section 1.471-1, Income Tax Regs., nor required to use an accrual method by section 1.446-1(c)(2)(i), Income Tax Regs. See Osteopathic Med. Oncology & Hematology, P.C. v. Commissioner, supra at 391-392.

We hold, therefore, that respondent abused his discretion in requiring petitioners to change from the cash method of accounting to an accrual method.

---

[7](...continued)
is the recognition that petitioners' cash method of accounting does reflect their income clearly, albeit not as clearly as the accrual method. Although the language used in respondent's notices of deficiency may be nothing more than a verbal foot-fault, or an ill-phrased attempt to summarize the requirements of sec. 471(a), respondent has offered no evidence to explain why the determinations were phrased as stated in the notices. Although the Commissioner's determination that a taxpayer's method of accounting does not clearly reflect its income is entitled to great deference, the Commissioner may not require a taxpayer to change from a method of accounting that clearly reflects income to another method of accounting because the Commissioner determines that the alternate method will reflect the taxpayer's income more clearly. See Ansley-Sheppard-Burgess Co. v. Commissioner, 104 T.C. 367, 371 (1995).

In light of our holding, we find it unnecessary to address petitioners' additional assignments of error.[8] We have carefully considered all remaining arguments made by respondent for a result contrary to that expressed herein, and to the extent not discussed above, we find them to be irrelevant or without merit.

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>for petitioners</u>.

---

[8]On brief, petitioners made several additional arguments in support of their contention that respondent abused his discretion. Petitioners argued that the cash method clearly reflected their income, irrespective of whether inventories were required by sec. 1.471-1, Income Tax Regs.; that an audit of Mid-Del's 1993 Form 1120 resulted in an authorization for Mid-Del (and PC, by implication) to use the cash method; that sec. 448 permitted petitioners' continued use of the cash method, also irrespective of whether merchandise inventories were required; and finally, that computational errors were made in the sec. 481 adjustment.